**Bernard HAHN, Plaintiff,**

v.

**N. Preston BREED, David Fain Brown, Michael John Brown, A. Bryant Foster, David L. Ruecker, Edwin G. Shifrin, Apex Oil Company, a Missouri Partnership, Goldstein Oil Co., Novelly Oil Co., Apex Holding Co., Apex Maryland, Inc., Apex R.E. & T., Inc., Samuel R. Goldstein, P.A. Novelly, S.C.R. Investment Company and Enterprise Development Group, Defendants.**

No. 82 Civ. 8091.

United States District Court,
S.D. New York.

May 30, 1984.

Garwin, Bronzaft & Gerstein, New York City, for plaintiff; Bertram Bronzaft, Bruce E. Gerstein, Scott W. Fisher, New York City, of counsel.

Hughes, Hubbard & Reed, New York City, for defendants; Ronald A. Stern, Thomas D. Goldberg, Hughes, Hubbard & Reed, Washington, D.C., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This class action was commenced by plaintiff, Bernard Hahn, a shareholder of Enterprise Development Group ("EDG"), a business trust organized under the laws of Massachusetts ("the Trust"), to rescind a merger whereby the Trust was merged with and became an indirect and wholly owned subsidiary of Apex Oil Company ("Apex") on August 10, 1982.

This is the plaintiff's second lawsuit attacking the merger. Plaintiff, who owned 100 shares of EDG, previously filed a class action in the New York State Supreme Court in August 1982 to enjoin the merger or set it aside on the ground that the merger price was unfair and that the trustee defendants had breached their fiduciary duty to the EDG shareholders by entering into the merger.

This class action was instituted in December 1982 after defendants had moved to dismiss plaintiff's state complaint. The defendants include the six former trustees of EDG, the merged company, Apex, various Apex subsidiaries, and individuals who are beneficial owners of shares in one or more Apex companies. (For convenience, the various Apex companies will be referred to as "Apex"). The complaint alleges three causes of action. First, that the defendants violated section 14(a) of the Securities Exchange Act of 1934 ("The Act")[1] and Rule 14(a)–9 promulgated thereunder,[2] based on alleged misstatements in or omissions from the proxy statement sent to shareholders to consider the merger proposal; second, that the omissions from and misrepresentations contained in the proxy statement also violated section 10(b) of the Act[3] and its implementing Rule 10b–5;[4] and third, that the defendants breached their fiduciary duties to the public shareholders, in violation of state common law as pendent to the federal claims under counts 1 and 2. Plaintiff seeks judgment voiding the merger; compensatory damages; and an order directing that David Fain Brown, who was Chairman of the Trust's Board of Trustees, pay to the class any monies he received from Apex pursuant to a Consulting Agreement. Jurisdiction is grounded upon section 27 of the Act[5] and pendent jurisdiction.

The defendants move for an order pursuant to Rule 12(b)(1), 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure dismissing the complaint for lack of subject matter jurisdiction, failure to state a claim for relief and failure to plead fraud with particularity. Alternatively, they move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in their favor, in support of which they have submitted a Rule 3(g) statement of material facts as to which they assert there is no

1. 15 U.S.C. § 78n(a).

2. 17 C.F.R. § 240.14a–9.

3. 15 U.S.C. § 78j(b).

4. 17 C.F.R. § 240.10b–5.

5. 15 U.S.C. § 78aa.

genuine issue of fact to be tried.[6] The plaintiff, in his response to the Rule 3(g) statement, has submitted a diffuse and argumentative statement which obscures rather than clarifies whether there are genuine issues of fact; finally, he argues that he has had no discovery to date to substantiate his allegations, which, he alleges, forecloses the granting of summary judgment at this time. With respect to this contention, it should be noted that the motion is based upon the proxy statement and other documentary matter, the contents of which are not in dispute.

EDG, organized in 1969, originally operated as a Real Estate Investment Trust ("REIT")[7] that primarily granted first mortgage loans to real estate developers. Upon its organization, it was known as the C.I. Mortgage Group, but in May 1981, the name was changed to EDG. In the mid-1970's, faced with serious financial losses due to developers defaulting on their loans, the Trust ceased to qualify as a REIT and ceased operating as a mortgage lender. Instead, its principal focus became the acquisition and then the management of properties secured by loans in default and became essentially a real estate development and operating company. By late 1979, EDG regained a healthy financial position through the restructuring of its debt and selling a substantial portion of its real estate assets.

As a result of its direct purchases of shares and those by corporations in which it owned stock in 1980 and 1981, Apex, by March 1982, owned 49.7% of the outstanding shares of the Trust. It then proposed to EDG's Board of Trustees that Apex Holding acquire the entire remaining equity interest in the Trust for cash. Upon receipt of the proposal, EDG's Board of Trustees appointed a Committee of the Board, the Ownership Planning Committee, to discuss and negotiate with Apex the terms of the proposed acquisition. The Committee consisted of N. Preston Breed, David Fain Brown and John Michael Brown. The Committee retained The First Boston Company ("First Boston"), an investment banking firm, to advise it in connection with the determination of a price in a merger or similar transaction that would be fair to the public shareholders.[8] After an analysis of the business operations and financial condition of the Trust, First Boston advised the Committee that a cash price of $10.50 per share was fair to the public shareholders from a financial point of view.

On April 19, 1982, the Ownership Planning Committee and EDG's Board of Trustees approved a merger proposal under which Apex Holding Company would acquire the entire equity interest in EDG. Each public shareholder would become entitled to receive $10.50 in cash for each share held, or under an amendment which was part of the merger plan, in lieu of receiving $10.50 per share in cash, a shareholder would be entitled to be paid in cash the fair value of his shares as determined in an appraisal proceeding. In order to become effective, the merger required the affirmative vote of (1) two-thirds of the outstanding shares, *and* (2) a majority of the votes cast for and against the merger by the public shares. Thus, in effect, the public shareholders had a veto power over the merger proposal. The proposed merger was approved at the meeting held on August 10, 1982. Apart from the shares owned by EDG and its affiliates that were voted in favor of the merger, 94.7% (public shareholders) were voted for the merger, and 5.3% were voted against it. The price of $10.50 per share exceeded the market price of shares on the date the merger was announced ($7.50 per share) and exceeded the highest market price of the shares during the preceding seven years.

Against that background we consider the plaintiff's claims in this action. Plaintiff's

---

6. *See* Rule 3(g) of Civil Rules of United States District Court for the Southern District of New York.

7. *See* 26 U.S.C. § 856.

8. Ex. A, p. 6.

complaint alleges various misstatements [9] or omissions in the proxy material. The essence of his charges, in the main, center principally about EDG's substantial tax loss carryforwards and their utilization by Apex soon after the merger; the employment or affiliation of members of the Ownership Planning Committee; and an agreement whereby David Fain Brown, following the merger, was to receive $1 million for consultation services over a five-year period.

The defendants, on the other hand, urge that the matters allegedly omitted were in fact disclosed or were not necessary in order to render any of the statements in the proxy materials not false or misleading; that the alleged misstatements or omissions are not material in the light of the facts disclosed. In substance, they urge that the proxy statement met the standard of materiality as stated by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.;* [10] that it fully and fairly set out such relevant and material facts to enable a reasonably prudent stockholder to vote in an informed manner on the proposed merger.

We consider each claim of alleged omissions or misstatements separately.

**(1) INDEPENDENCE OF OWNERSHIP PLANNING COMMITTEE.**

█ Plaintiff alleges that the proxy statement contained a false statement with respect to members of the Ownership Planning Committee, which had recommended approval of the merger. The covering letter to the proxy statement stated:

> As a result of its 49.7% ownership and its representation on the Board of Trustees, Apex may be deemed in control of the Trust. Therefore, in order to assure that the merger would be fair to public shareholders, the Board of Trustees estab-

lished a Committee comprised of Trustees who are not employed by, or affiliated with, Apex, to evaluate the proposed merger again.

The clause "Trustees who are not employed by, or affiliated with, Apex Oil" is repeated in a section entitled "Summary of Proxy Statement." The complaint alleges that the foregoing statement was "intentionally false" in that David Fain Brown was a person closely affiliated with Apex Oil. The charge appears to be limited to Brown. However, plaintiff has isolated the above references from other portions of the proxy statement which, on their face, negate his allegation. The relationship between Brown and Apex is set forth at three separate places in the proxy statement.[11] One of these, headed "Conflicts of Interest," is given equal emphasis with the Board's recommendation of the merger (it directly follows the recommendation) and is cross-referenced with other sections in the statement. The "Conflicts of Interest" section discloses matters with respect to various conflicts of interest and, among other matters, states that Brown, "Chairman of the Board and of the Ownership Planning Committee, has accepted a five-year Consulting Agreement with Apex worth in the aggregate $1 million commencing after the merger" and contains other references to the Consulting Agreement and its terms. This Consulting Agreement for future services, by itself, did not render Brown a person "affiliated with Apex." [12] Plaintiff also attacks the Consulting Agreement on other grounds, as discussed hereafter. Other than plaintiff's assertion, there is no support for his charge that the statement that the members of the "Ownership Planning Committee were not employed by or affiliated with Apex" was false or misleading. This aspect of plaintiff's claims must be dismissed.

**9.** Complaint ¶¶ 74–90.

**10.** 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

**11.** Pages 3, 8 Conflicts of Interest Section, and 28.

**12.** So, too, he was not an "affiliated" person as that term is defined under EDG's declaration of trust, which is set forth in the Proxy Statement.

**(2) THE FIVE–YEAR CONSULTING AGREEMENT.**

■ It is undisputed that the Consulting Agreement and its terms were disclosed in the proxy statement in three separate sections. However, plaintiff charges a failure to disclose that in fact its true purpose was payment to Brown for his past services in effectuating the merger on terms favorable to Apex, rather than what it purports to be on its face, a contract for future services to be rendered following the merger. In sum, however variously stated, the charge is that Brown was to be paid a fee of at least $1 million for his services in effectuating the merger and that the Consulting Agreement was fictitious in order to conceal that fact.

Plaintiff, in support of his position, points to the fact that under the contract full payment is authorized to Brown in advance of his rendering any service to Apex; also, that Brown retained his position as counsel and executive officer of another company (City Investing), which circumstance, plaintiff urges, by itself raises a question that Brown could render services of the value of $1 million to Apex, and finally, he alleges the Proxy Statement references to discussions between Brown and Apex as to a consulting contract were designed to give the impression that they had arisen at or about the time of the proxy statement and were not agreed upon until June 11, 1982, after the merger terms had been agreed upon.[13] This latter aspect of plaintiff's charge is based upon the following excerpt contained in the proxy statement:

Discussion of a general and preliminary nature between Apex and Mr. Brown with respect to such arrangement (the consulting agreement) commenced in 1980, well before discussions between the Ownership Planning Committee and Apex with respect to the merger. *However, no such discussions concerning the consultancy agreement between Apex and Mr. Brown occurred during the deliberations of the Ownership Planning Committee,* and the terms of the consultancy arrangement were not agreed upon until June 11, 1982 (after the merger terms had been agreed upon.) (emphasis supplied).[14]

In effect, the emphasized portion states that there was a hiatus in the discussions of the proposed agreement during the period of the Committee deliberations in evaluating the proposed merger.

If one accepts uncritically and at face value that in fact there was a "deep freeze" in the negotiations between Brown and Apex on a proposed consultative arrangement during the deliberations of the Ownership Planning Committee—deliberations presumably refer to the period during which the Committee was considering factors pertaining to the fairness of the merger offer to the public shareholders—then there is no basis for a charge of conflict of interest. But if in fact there were continued negotiations between Brown and Apex as to a consultative contract involving a payment of $1 million or more to Brown during the very time the Committee, of which he was Chairman, had under deliberation and consideration whether "the merger would be fair to public shareholders," clearly there was a conflict of interest.

In response to the charge that the consultative agreement was a sham to conceal payment of a million dollar fee to Brown in effectuating the merger, the defendants respond that plaintiff is objecting to the "characterization" of the fee arrangement.[15] They contend that this claim is foreclosed by *Golub v. PPD Corporation*.[16] There the proxy material distribut-

13. Complaint ¶¶ 79–80.

14. Proxy Statement p. 8.

15. *See Goldberg v. Meridor,* 567 F.2d 209, 218 n. 8 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Klamberg v. Roth,* 473 F.Supp. 544, 551 (S.D.N.Y.1979) (so long as material facts disclosed, not deceptive to fail to "characterize" facts with "perjorative nouns and adjectives," or to fail to verbalize all adverse inferences.)

16. 576 F.2d 759 (8th Cir.1978).

ed in connection with the sale of the assets of a corporation disclosed that the acquiring company would retain the corporation's top management and pay them substantial bonuses if they remained with the corporation and certain future earnings targets were realized. The plaintiff, in *Golub*, alleged that the proxy materials failed to disclose that the bonuses to be paid to the corporate officers, who were also controlling shareholders, were not additional compensation for services to be rendered, but actually were premiums for their willingness to sell the assets. The Court held that the disclosure and existence of the amount of the bonuses sufficed.

Actually, the plaintiffs are not complaining about any absence of facts in the proxy statement. Their complaint is that those who prepared the statement did not "disclose" what the plaintiffs say was the true motivation of old PPD's management in selling the assets of the company, and did not characterize the bonus aspect of the transaction as plaintiffs would have it characterized. Under the Act and regulations plaintiffs were not entitled to have such a "disclosure" or such a characterization.[17]

As has so often been said, cases under the Act charging omissions or misstatements in proxy statements must be decided upon their own individual facts.[18] *Golub* is distinguishable on its facts from plaintiff's claim with respect to the consultative contract. Here, unlike the plaintiffs in *Golub* who did not complain "about any absence of facts in the proxy statement,"[19] the plaintiff does complain about the omission of material facts in the proxy statement relative to the Consulting Agreement—the failure to disclose that it was not a contract for future services to be rendered to Apex, but the payment of a fee to Brown for his services in effectuating the merger.

Finally, defendants urge that plaintiff's allegations of the true nature and timing of the agreement between Brown and Apex fail to state a section 14(a) claim because the asserted "true facts" are not material. Thus they argue that since the proxy statement did disclose the existence of various potential conflicts of interest involving Apex and Brown and other Trustees of EDG, the additional disclosure of what plaintiff claims is the true nature of the Consulting Agreement and its timing would not have significantly altered the "total mix of information" provided the shareholders. The Court does not agree. If in fact Brown, Chairman of a committee specially appointed to assure that "the merger would be fair to public shareholders," was to receive $1 million from Apex in effectuating the merger, and if in fact he negotiated a contract for his services with Apex during the very time the Committee was deliberating on the fairness of the merger proposal, there was not only a conflict of interest, but these were matters which a reasonably prudent public shareholder would consider important in deciding how to vote with respect to the merger proposal.[20]

The motion to dismiss this claim is denied. It presents issues of fact which foreclose defendants' motion for summary judgment. Plaintiff is entitled to pretrial discovery, limited, however, to the claim with respect to the circumstances under which the Consulting Agreement was entered into and its timing.

---

**17.** *Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir.1978).

**18.** *See, e.g., Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 951 (2d Cir.1978) (court compares facts of instant case with facts in *Browning Debenture Holders' Committee v. DASA Corp.*, 524 F.2d 811 (2d Cir.1975)); *Gould v. American Hawaiian S.S. Co.*, 535 F.2d 761, 772 (3d Cir. 1976) (court found cases supporting defendant's argument to be "clearly distinguishable on their facts."); *Gluck v. Agemian*, 495 F.Supp. 1209, 1214–15 (S.D.N.Y.1980) (court analyzes facts of *SEC v. Parklane Hosiery Co.*, 558 F.2d 1083 (2d Cir.1977)).

**19.** *Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir.1978).

**20.** *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976).

**(3) FAILURE TO DISCLOSE PLAN OR SCHEME TO BUY EDG SHARES AT UNDERVALUED PRICE.**

■ Plaintiff next charges that the proxy materials failed to disclose that Brown and Apex had devised a plan and scheme to enable Apex Oil to purchase EDG's publicly held shares at a price approximating book value that failed to include any value ascribed to EDG's substantial tax loss carryforwards, which Brown and Apex knew Apex intended to utilize immediately upon the merger.[21] Under this claim, plaintiff does not allege that any of the relevant underlying facts to the terms of the merger were not disclosed in the proxy statement, but rather asserts that the proxy statement should have characterized those facts as constituting a scheme or plan to defraud. In substance, the charge is that the nondisclosure of the alleged scheme was a breach of fiduciary duty which constituted a violation of the Act. Defendants argue that this claim is an attempt to convert plaintiff's state breach of fiduciary claim into a federal securities act violation in circumvention of the Supreme Court's holding in *Santa Fe Industries v. Green*,[22] that federal law does not impose fiduciary duties on corporate directors—that this is a matter of state law. Our Court of Appeals has noted that *Santa Fe* makes clear "that no such duties are imposed by federal law upon corporate directors and that violation of any such state law fiduciary duties, including conflicts of interest ... will not support a claim of constructive fraud under Section 14a" of the Act.[23] And in *Biesenbach v. Guenther*,[24] the Third Circuit Court of Appeals said:

In effect appellants are stating that the failure to disclose the breach of fiduciary duty is a misrepresentation sufficient to constitute a violation of the Act. We refuse to adopt this approach, which would clearly circumvent the Supreme Court's holding in *Santa Fe*.

Essentially under this claim the defendants are charged with failure to announce their own alleged wrongful conduct in devising a scheme to defraud the public shareholders based upon the omission of an ascribed value for the carryforwards—in effect their failure to make a public "confession of selfish motive."[25] As has been astutely observed:

But it is bemusing, and ultimately pointless, to charge that directors perpetrated a "material omission" when they failed to (a) discover and adjudge faithless motives for their actions and (b) announce such a discovery in reporting the products of their managerial efforts and judgment. The securities laws, while their central insistence is indeed upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external.[26]

Other than to allege the charge of a scheme to defraud and its nondisclosure, plaintiff gives no support for this claim. The facts of the merger plan itself are disclosed in the proxy statement. This asserted claim is dismissed for failure to state a claim upon which relief can be granted.

**21.** Complaint ¶ 77.

**22.** 430 U.S. 462, 474–80, 97 S.Ct. 1292, 1301–04, 51 L.Ed.2d 480 (1977).

**23.** *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1084 (2d Cir.1977).

**24.** 588 F.2d 400, 402 (3d Cir.1978).

**25.** *Rodman v. Grant Foundation*, 608 F.2d 64, 71 (2d Cir.1979). *See also Gluck v. Agemian*, 495 F.Supp. 1209, 1214 (S.D.N.Y.1980); *Lewis v. Op-*

*penheimer*, 481 F.Supp. 1199, 1204 (S.D.N.Y. 1979).

**26.** *Stedman v. Storer*, 308 F.Supp. 881, 887 (S.D. N.Y.1969), *quoted with approval in Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978). *See also Lavin v. Data Systems Analysts, Inc.*, 443 F.Supp. 104 (E.D.Pa.1977), *aff'd*, 578 F.2d 1374 (3d Cir.1978).

**(4) FAILURE TO MAKE FULL DISCLOSURE OF FACTS PERTAINING TO EDG'S TAX LOSS CARRYFORWARDS.**

██ Plaintiff advances a number of claims which center about EDG's tax loss carryforwards which, at the time of the merger, were $27,500,000.[27] The proxy statement noted that the merger price was slightly in excess of the Trust's net book value at the end of its last fiscal year. Plaintiff claims that the proxy statement was false and misleading because it failed to disclose (1) that the book value of the EDG shares did not "reflect any value" derivable by Apex from the use of the tax loss carryforwards, and (2) that Apex intended, immediately after the merger, to obtain substantial benefits from the tax loss carryforwards by merging EDG with an Apex subsidiary which had a substantial income in order to reduce the subsidiary's taxes and that such action in fact was taken on October 1, 1982, six weeks after the merger approval.

The proxy material, in describing "Reasons for the Merger," among other matters, stated: "A merger with an Apex subsidiary, and possible ensuing contributions to the Trust's capital, might enable the Trust to utilize its federal income tax net operating loss carryforwards more rapidly. See Note 6 of Notes to Consolidated Financial Statements for a description of the net operating loss carryforwards of the Trust."[28] Further, it stated that "[s]ubject to the effectiveness of the merger, one or more subsidiaries [of Apex] may be merged into the Trust, with the Trust being the surviving entity."[29] The proxy statement also disclosed, through notes accompanying EDG's audited and unaudited financial statements the dollar amount derived by the Trust from utilization of its operating loss carryforwards during the fiscal years 1979–1981.[30]

The proxy statement made abundantly clear that on October 31, 1981, EDG had "operating loss carryforwards for Federal income tax purposes of approximately $29 million," (proxy statement, page 17; $27.5 million at the time of the merger) and their prospective utilization by merging EDG with an Apex subsidiary and had demonstrated the value of a tax carryforward by its use by EDG for the three fiscal years prior to its merger and the income tax benefits derived from its use. The plaintiff contends that this was inadequate—that the statement should have pointedly emphasized that Apex contemplated utilizing the tax carryforwards within a short period of time after the merger, and in addition have specified a dollar amount value for such intended immediate use. However, the proxy statement leaves no room to doubt that one of the reasons for the merger was to permit more rapid utilization of the carryforwards. With information in the proxy statement that by the utilization of its tax loss carryforwards the Trust had derived income tax benefits in the three fiscal years prior to the vote on the merger, and information as to the amount of available carryforwards for future use, the shareholders were aware that the carryforwards were of substantial value and were in a position to assess this in their evaluation of the fairness of the $10.50 per share cash merger price. Once the shareholders approved and the merger became effective, the decision when and with respect to which of its subsidiaries to utilize the tax benefits rested with Apex. The timing by Apex of when to obtain the benefits of the carryforwards and to which of its subsidiaries it was to be utilized was not material, since EDG shareholders "would have no

---

27. Complaint ¶¶ 82–86.

28. Proxy Statement p. 4.

29. Proxy Statement p. 12.

30. Proxy Statement pp. 4, 16, 17, 42, 44 ("Income Taxes"). Page 44 of the statement provides:

"For the years ended October 31, 1980 and 1979, the Trust realized extraordinary items in the amount of $4,777,787 and $26,786,754, respectively, reflecting the recognition for financial reporting purposes of the reduction of income taxes arising from utilization of operating loss carryforwards."

further relationship with [EDG or Apex] once the merger was completed...."; further, "A buyer's use of an acquired asset ... is his own concern."[31] This claim is dismissed for failure to state a claim upon which relief can be granted.

### (5) FAILURE TO DISCLOSE APEX'S ACQUISITION OF ANOTHER COMPANY.

To bolster its contention that the book value of the shares should have been increased by reflecting a value for the EDG tax loss carryforwards, plaintiff refers to an earlier merger transaction whereby Apex purchased Alamand Corporation, which had $18,000,000 tax loss carryforwards, from Moraga Corporation. Plaintiff asserts that Apex was not in control of Moraga and that it was an arms length transaction. The complaint alleges that Apex paid Moraga approximately $9,000,-000 over the book value per share in consideration for Alamand tax loss carryforwards. Plaintiff contends that this information should have been disclosed in the proxy statement. The transaction occurred in 1980, two years before the instant one and was unrelated to it.

There is no requirement under proxy rules that the details of prior transactions by an acquired company be disclosed to the shareholders of the acquired company in connection with a proposed merger.[32] What is required is full and fair disclosure of all material matters. Prior merger proposals by an acquiring company present their own individual requirements as to the material information to be submitted to the shareholders of the company involved. They require disclosure of all relevant matters to enable the shareholders to make an informed judgment with respect to their votes. The myriad of detailed information to be furnished to the shareholders differs from merger to merger. The negotiations relating to and the factors that result in a price offered for shares of the acquired company differ from merger to merger. Moreover, here it appears that the information regarding the Alamand transaction was already publicly available. This Court, in *Flum Partners v. Child World, Inc.*,[33] held that where a competitor's acquisition pattern "was already publicly available,"[34] there was no need to disclose it. This rationale is equally applicable to the acquisition pattern of the acquiring company, in this case, Apex. To require proxy statements to include the information required in the proxy material of prior and unrelated transactions would "bury the stockholders in an avalanche of trivial information—a result hardly conducive to informed decision making."[35]

Pursuant to Rule 12(b)(6) this claim is dismissed for failure to state a claim upon which relief can be granted.

### (6) PESSIMISTIC VIEW OF EDG'S FUTURE PROSPECTS.

Plaintiff's final claim is that the proxy statement was designed to communicate to the shareholders "a general pessimistic view" with regard to EDG's operations and growth prospects that are inconsistent with views expressed in earlier documents mailed to shareholders and filed with the SEC, and which unfairly induced the shareholders to approve the merger.[36] The charge centers principally about "leveraged borrowing" relative to financing current operations and expansion of the company's real estate development plans. The proxy material under "Reasons for the Merger" states that "While the Trust could raise additional funds for diversification or ex-

---

**31.** *Lewis v. Oppenheimer*, 481 F.Supp. 1199, 1207 (S.D.N.Y.1979).

**32.** *See Rodman v. Grant Foundation*, 608 F.2d 64, 71 (2d Cir.1979); 17 C.F.R. § 240.14a–101, Item 14.

**33.** 557 F.Supp. 492 (S.D.N.Y.1983).

**34.** *Id.* at 499.

**35.** *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2131–32, 48 L.Ed.2d 757 (1976). *See also Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 951 (2d Cir.1978).

**36.** Complaint ¶¶ 87–90.

pansion by borrowing against its assets, such leveraged borrowing would increase the financial risk of the Trust ... [which] risks are deemed by the Trust and Apex to be unattractive to the Trust in the current economic environment." [37] After reference to matters touching upon capital requirements to fund operations and growth opportunities, the proxy statement further expresses the view that "the prospects for major diversification or expansion of the Trust's business are not great in the near term," [38] and also states that "the general business and financial prospects of the Trust are unlikely to improve significantly in the near future, absent additional capital investment or diversification." [39]

The plaintiff charges that the views so expressed are inconsistent with the Trustee's views set forth in earlier reports sent to the shareholders and filings with the SEC. In particular, plaintiff refers to EDG's Form 10–K filed with the SEC for the fiscal year ended October 31, 1980, subscribed to January 29, 1981, where in describing the adoption of a Business Plan under which real estate development became EDG's principal activity, it was noted that "the Trust intends to operate on a 'leveraged basis,' at times borrowing a substantial part of the funds it will require." [40] A letter to shareholders dated March 6, 1981, notes with respect to expansion activities "that an internal generation of cash and proceeds from borrowings will be fully utilized to maximize those operations." [41] In a letter to shareholders dated September 25, 1981, EDG Trustees stated that EDG "maintains a healthy financial posture" and is progressing in its real estate developments,[42] and in a letter to shareholders dated April 20, 1982, two months prior to the submission of a proxy statement to EDG shareholders, EDG Trustees declared "the Trust has continued to improve upon its healthy condition." [43]

The statements with respect to leveraged borrowing and increased financial risk to the Trust are not representations of fact but expressions of opinion. Such statements are not actionable under the securities law.[44] Moreover, the proxy material does not appear to be in conflict with prior statements as to leveraged borrowing. Under the 1981 Business Plan,[45] real estate development became a principal activity of the Trust and was financed by leveraged borrowing. As to this activity the proxy statement virtually parallels that contained in the 1981 SEC 10–K Form with respect to leveraged borrowing.[46] As the defendants point out, the major difference is the Trustee's view, expressed some eighteen months after the SEC filing, that the financial risks to the Trust of leveraged borrowing were "unattractive in the current economic environment." This was a judgment of the nondesirability of such financing with respect to the Trust's future real estate development activities in the existing economic climate.

So, too, the proxy statements that the "prospects for major development of the Trust business are not great in the near term" and that "the general business and financial prospects of the Trust are unlikely to improve significantly in the near future, absent additional capital investment" are not representations of fact but opinions with respect to the likelihood of future occurrences. Plaintiff offers no objective fact to show or even suggest that the views so expressed in the proxy statement did not reflect the considered judgment of the Trustees and were not honestly held or

37. Proxy Statement p. 4.

38. Proxy Statement p. 4.

39. Proxy Statement p. 5.

40. Ex. C, p. 5.

41. Ex. C.

42. Ex. D.

43. Ex. E.

44. *Zerman v. Ball,* 735 F.2d 15 at 20–21 (2d Cir.1984); *Darvin v. Bache, Halsey, Stuart & Shields,* 479 F.Supp. 460, 462–64 (S.D.N.Y.1979).

45. Proxy Statement pp. 18–19; Complaint ¶ 32.

46. Proxy Statement p. 18; *see also* pp. 20, 22.

that they were intended to mislead the shareholders.

Finally, plaintiff has not shown that the statements contained in the September 1981 and in April 1982 communications about EDG's "healthy posture" and "continued improvement" were not the fact at the time the statements were made. The Court finds that plaintiff has failed to state a claim under Rule 12(b)(6), and accordingly this claim is also dismissed.

In sum, the defendants' motion is denied as to claim (2)—"The Five-Year Consulting Agreement"—and granted as to all other claims alleged under the first and second causes of action for alleged violation of section 14(a) of the Act and Rule 14(a)(9) promulgated thereunder and of section 10(b) of the Act and Rule 10b–5 promulgated thereunder.

■■■ With respect to the one remaining claim—the Five-Year Consulting Agreement—all defendants move to dismiss it pursuant to Rule 9(b) of the Federal Rules of Civil Procedure for plaintiff's failure to plead "the circumstances constituting the fraud ... with particularity." The motion is denied as to David Fain Brown. As already noted, the complaint alleges that the proxy statement failed to disclose that the Consulting Agreement was not an agreement for future services, but a cover-up for payment to Brown "for effectuating the merger on terms favorable to Apex." The charge is that the contract is not what it purports to be and was executed as a device to conceal the payment of the fee. These allegations are of sufficient particularity to meet the requirements of Rule 9(b) as to Apex and David Fain Brown, the parties to the agreement under attack. However, they do not comply with the Rule as to the other defendants. The only allegations as to the Trustees other than David Fain Brown are the conclusory allegations that they caused the issuance of the proxy statement "knowing or having reasonably known" that it contained the alleged misleading statements and failed to disclose the alleged omission. This conclusory allegation, without specificity of fraudulent conduct as to each of the defendants, is inadequate to meet the requirements of Rule 9(b).[47] The motion to dismiss the complaint for failure to comply with the requirements of Rule 9(b) is granted as to all defendants other than David Fain Brown and Apex, as to whom it is denied.

There remains for final consideration plaintiff's third cause of action, charging all defendants with breach of fiduciary duty under the common law of the State of New York. As previously noted, this action was commenced after defendants had moved to dismiss plaintiff's previously instituted state court action, which charged that defendants had breached their fiduciary duty to EDG shareholders by entering into the merger agreement, which was unfair to them. The cause of action in the state complaint encompasses the same cause of action as alleged in Count III in this suit. The motion made by the defendants to dismiss the state court action was denied by a justice of the State Supreme Court and the dismissal was affirmed upon appeal. The plaintiff urges that the defendants' motion to dismiss the third cause of action be denied on the ground of collateral estoppel, which the defendants oppose upon a contention that the state's ruling is interlocutory and only a final judgment has collateral estoppel effect.[48] The Court does not reach the disputed issue of collateral estoppel. The posture of the case has changed by reason of the Court's rulings as set forth above. The only viable claim that remains is that under the federal secu-

---

**47.** See *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 120–21 (2d Cir.1982) (allegation that directors were in possession of "material" facts and personally "knew or were recklessly indifferent to the fact" that documents referred to in the complaint failed to "furnish the required factual predicate for allegations of fraud and deception.")

**48.** Citing *Kilduff v. Donna Oil Corp.,* 74 A.D.2d 562, 563, 424 N.Y.S.2d 282, 284 (2d Dep't 1980); *Eastern Air Lines, Inc. v. Trans Caribbean Airways, Inc.,* 29 A.D.2d 379, 381–82, 288 N.Y.S.2d 317, 320 (1st Dep't), aff'd mem., 23 N.Y.2d 709, 296 N.Y.S.2d 153, 243 N.E.2d 756 (1968); 5 Weinstein, Korn & Miller, New York Civil Practice ¶ 5011.10 at p. 50–78.

rities act against David Fain Brown and Apex with respect to the Five-Year Consulting Agreement.

The third cause of action is alleged under the principle of pendent jurisdiction. With the federal securities violations now streamlined and limited to two defendants under the Consulting Agreement, it appears to this Court that the state common law charge of breach of fiduciary duty against all defendants should be tried in the state court where plaintiff instituted his first action. That claim, which raises the issue of the fairness of the merger to a shareholder of a foreign corporation, involves the internal affairs of a foreign corporation.[49] The issues under the asserted state claim clearly predominate and involve far more factual proof against the sixteen defendants named therein than that to be considered in the federal claims against the two defendants under the Five-Year Consulting Agreement federal claim. The Court's power to determine a pendent jurisdiction claim "need not be exercised in every case in which it is found to exist."[50] This is such a case under its present posture. It would involve wasteful and duplicitous activities by court, counsel and litigants in two different courts, when a full disposition can be made in the state court where the common law claims were initially presented.

Under all the circumstances, the motion to dismiss the third cause of action is granted in the exercise of discretion.

So ordered.

---

49. *See Prescott v. Plant Industrial,* 88 F.R.D. 257, 261 (S.D.N.Y.1980); *Mantei v. Creole Petroleum Corp.,* 61 A.D.2d 910, 402 N.Y.S.2d 822, 823 (1st Dep't 1978).

50. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). *See, e.g., Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798 (2d Cir.1979); *Nolan v. Meyer,* 520, 96 S.Ct. 567, 46 L.Ed.2d 408 F.2d 1276 (2d Cir.), *cert. denied,* 423 U.S. 1034 (1975).