**Bernard HAHN, Plaintiff,**

v.

**N. Preston BREED, Defendants.**

**No. 82 Civ. 8091 (EW).**

United States District Court,
S.D. New York.

April 26, 1985.

Garwin, Bronzaft & Gerstein, New York City, for plaintiff; Bruce E. Gerstein, Scott W. Fisher, of counsel.

Hughes Hubbard & Reed, New York City, for defendants; Ronald A. Stern, Jay Kelly Wright, Thomas D. Goldberg, of counsel.

EDWARD WEINFELD, District Judge.

In an opinion dated May 30, 1984,[1] with which familiarity is assumed, this Court dismissed all of plaintiff's claims except his charge that a five year consulting agreement between David Fain Brown and Apex Oil Company ("Apex") in fact was not a consulting agreement but payment for services rendered by Brown in effecting the merger of Enterprise Development Group ("EDG") and a subsidiary of Apex. The Court held that the period of time when Brown and Apex negotiated the consulting agreement was of significance on the issue of conflict of interest that foreclosed dismissal of plaintiff's claim. The Court granted plaintiff limited discovery as to the circumstances and the timing under which the consulting agreement was entered into.[2] Discovery has now been completed.

---

1. *Hahn v. Breed,* 587 F.Supp. 1369 (S.D.N.Y. 1984).

2. *Id.* at 1374–75.

Plaintiff asserts that three facts, unknown to him when he responded to defendants' previous motion, entitle him to summary judgment on his remaining claim. Defendants oppose his motion and cross-move for summary judgment on the two fact issues identified by the Court in its May 30 opinion, namely, the nature and timing of negotiation of the consulting agreement. In addition, plaintiff moves pursuant to Fed. R.Civ.P. 23 for class certification.

## THE MOTIONS FOR SUMMARY JUDGMENT

The first of the alleged new facts on which plaintiff relies bears on the dispute about the true nature of the consulting agreement, which is also one focus of the defendants' cross-motion. Plaintiff claims to have discovered that the consulting agreement executed by Brown and Apex expressly provides that the "Consultancy is *contingent upon* and will commence immediately after consummation of the contemplated merger."[3] While the proxy statement no doubt would have been more precise had it stated that the consulting agreement was "contingent" upon consummation of the merger rather than that Brown's consulting services would commence "after the Merger is consummated," as it did in several places,[4] it is indeed questionable whether such a change in wording would have made any difference to a reasonable shareholder in deciding how to vote on the merger proposal. More importantly, however, even assuming that the contingent nature of the consulting agreement was not adequately disclosed—and, as noted, this point is questionable—the fact that the consulting agreement was contingent upon consummation of the merger is not conclusive proof, as plaintiff asserts, that the agreement was a reward to Brown for his role in helping Apex to buy out EDG's public shareholders on terms favorable to Apex. This fact is equally consistent with defendants' contention that the agreement was a bona fide contract for future services—that, as a practical matter, Brown could not render service to Apex effectively unless and until the merger was consummated and his responsibilities to EDG and their demand upon his time ceased. This dispute about the true nature of the consulting agreement can be resolved only by ascertaining the intent of the parties to the agreement, namely, Brown and Apex, and as our Court of Appeals has emphasized so often, questions of intent are, with rare exceptions, ordinarily inappropriate for resolution on a motion for summary judgment.[5]

For the same reason, defendants' cross-motion for summary judgment on this question is also denied. The existence of the contingency provision in the executed agreement raises a factual issue about the true nature of the agreement and is sufficient by itself to defeat this branch of defendants' cross-motion. In addition, plaintiff has alleged matters that call into question the value of the services that Brown allegedly has performed for Apex pursuant to the agreement, and also the defendants' claim that Brown was paid one million dollars as compensation for future services rather than for services in effecting the merger. These allegations include the absence of any written work product prepared by Brown for Apex, Brown's deposition statement that he never reviewed any documentation concerning Apex's business prior to June 1984, and Brown's full-time employment with City Investing Company during the same period in which he was obligated to render consulting services to Apex. Plaintiff's argument in opposition to defendants' summary judgment motion, denigrating the services Brown allegedly rendered to Apex under the consulting agreement, as to which Brown and others testified, borders on sheer nit-picking.

---

3. Plaintiff's exhibit K at ¶ 1(a) (emphasis added).

4. Plaintiff's exhibit A at pp. 3, 8, 28.

5. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985); *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984); *Grand Union Co. v. Cord Meyer Dev. Corp.,* 735 F.2d 714, 717 (2d Cir.1984); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983). For an exception to this rule, see *Samuels v. Eleonora Beheer, B.V.,* 500 F.Supp. 1357 (S.D.N.Y.1980), *aff'd,* 661 F.2d 907 (2d Cir.1981) (mem.).

Nonetheless, under controlling authorities in this circuit, this argument is sufficient to foreclose summary judgment as a matter of law by the Court and to require a disposition by a fact finder.

Plaintiff's second alleged new fact concerns payments made by EDG to Brown that were not disclosed in the proxy statement. Plaintiff alleges that the periodic payments Brown received under a separate consulting agreement with EDG during EDG's fiscal year 1981, which totalled $49,-000 on an annualized basis and were disclosed in the proxy statement for that year only, continued into the next fiscal year, through August 1982, during the time when the OPC was deliberating upon the fairness of the proposed merger. According to plaintiff, this undisclosed fact, coupled with the disclosure that "Apex may be deemed to control the Trust,"[6] renders materially false the statement that the "Merger price was unanimously approved by a committee of the Board of Trustees consisting of three Trustees who are not employed by, or affiliated with, Apex Oil and its subsidiaries."[7] This is especially so, plaintiff further asserts, in view of the statement that the "Trustees who are not officers of the Trust [Brown was not an officer] receive an annual fee of $12,500 for service as Trustees and $1,250 for service on committees of the Board of Trustees."[8]

■ Defendants counter that this claim was already considered and dismissed by the Court in its May 30 opinion and thus is barred under the doctrine of the law of the case. However, that doctrine as set forth in the cases cited by defendants has no application to a District Court reviewing its own ruling in a pending action before the entry of a final judgment, as our Court of Appeals has long recognized.[9] Although plaintiff's claim here is similar to one dismissed by the Court in its May 30 opinion, it is based on a new factual allegation. Plaintiff previously challenged the proxy statement that the OPC members "were not employed by, or affiliated with, Apex Oil" but failed because his "affiliation claim" was unsupported by any fact other than the existence of the five year consulting agreement between Brown and Apex, which was fully disclosed in the proxy statement.[10] Plaintiff's instant "affiliation claim" is based on an alleged consulting arrangement between Brown and EDG, a controlled subsidiary of Apex, which he claims was not disclosed in the proxy statement and of which he allegedly was not aware until he had an opportunity for discovery. Under these circumstances, the Court will not refuse to reconsider its judgment on this "affiliation claim" and, accordingly, plaintiff may amend his complaint to reassert the claim as alleged here.

■ This does not mean, however, that plaintiff is entitled to summary judgment on this claim as amended. Defendants argue with considerable force that Brown's relationship with EDG was sufficiently disclosed in the proxy statement, which stated that Brown "received compensation in the amount of $40,277 for services *as a consultant to the Trust* during Fiscal 1981" and, in a table setting forth information about the "present Trustees," listed Brown as "Chairman of the Board of Trustees of the Trust" and *"Consultant to the Trust,"* though without mentioning the amount of compensation he received.[11] Thus, at bottom, plaintiff's "affiliation claim" is that what is only implicit in the proxy statement

---

6. Plaintiff's exhibit A at p. 8.

7. *Id.* at p. ii.

8. *Id.* at p. 27 n. 1.

9. *See In re United States,* 733 F.2d 10, 13 (2d Cir.1984); *United States v. Birney,* 686 F.2d 102, 107 (2d Cir.1982); *Dictograph Prods. Co. v. Sonotone Corp.,* 230 F.2d 131, 134 (2d Cir.1956); compare *Fine v. Bellafonte Underwriters Ins. Co.,* 758 F.2d 50 (2d Cir.1985) (prior appellate court ruling is binding on district and appellate courts); *Doe v. New York City Dep't of Social*

*Servs.,* 709 F.2d 782, 788–89 (2d Cir.) (same), *cert. denied,* —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Fogel v. Chestnutt,* 668 F.2d 100, 108–09 (2d Cir.1981) (appellate court bound by its own prior ruling), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

10. *Hahn,* 587 F.Supp. at 1373.

11. Plaintiff's exhibit A at pp. 25, 28 (emphasis added).

should have been made explicit: that as a consultant to the Trust in fiscal year 1982, Brown continued to receive the consulting fee paid to him for his services in the prior year. Whether this particular omission is material or renders materially false the statement that Brown was not "employed by, or affiliated with, Apex Oil and its subsidiaries" during fiscal year 1982 involves "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." [12] Certainly, it cannot be said that this omission was so obviously important to a reasonable investor that reasonable minds could not differ on the question of its importance.[13] This amended affiliation claim is not ripe for summary judgment.

■ Plaintiff's third and last alleged new fact is that Brown did not inform his two co-members on the OPC that beginning in 1980 he and Apex had discussed a possible employment relationship until after the OPC had voted unanimously to approve the proposed merger price. This fact should have been disclosed in the proxy statement, plaintiff asserts, and its omission is material as a matter of law. Again, however, it is far from clear that reasonable minds could not differ about the importance of this omission. In their affidavits, the two co-members of the OPC stated that before the proxy statement was distributed to EDG shareholders they reviewed it, including its disclosure that Brown's and Apex's discussions had commenced in 1980, and continued to believe that the terms of the proposed merger were fair to EDG's public shareholders. If the Trustees did not consider these discussions significant enough to influence their votes, it is debatable whether disclosure of the Trustees' ignorance of such discussions would have affected the judgment of a reasonable shareholder in deciding how to vote on the proposed merger. At issue here is the judgment of the two Trustees and the opinion

of a reasonable shareholder. This issue cannot be resolved as a matter of law. Although it differs from the precise issues identified by the Court in its May 30 opinion as remaining to be resolved at trial, it relates to the same basic claim that Brown had an undisclosed conflict of interest as a result of his consulting agreement with Apex and the negotiations that preceded it. Accordingly, this claim, that the two OPC members' ignorance of the Brown-Apex discussions when they voted to approve the merger should have been disclosed, may be presented at trial.

The remaining matter on these motions for summary judgment is the second branch of defendants' cross-motion, which relates to the issue of the timing of the negotiation of the consulting agreement between Brown and Apex. According to the proxy statement, this negotiation did not occur while the OPC deliberated upon the fairness of the proposed merger, and defendants assert there is no basis for plaintiff's claim that this statement is false. They rely primarily upon the deposition testimony of Brown and P.A. Novelly, President and Chief Executive Officer of Apex, which they claim establishes that Brown and Novelly first discussed the possibility of a consulting arrangement between Brown and Apex in May 1982, several weeks after the OPC voted, on April 19, 1982, to approve the proposed merger price; that Brown and Novelly agreed on the essential terms of the arrangement in a telephone conversation in June 1982; and that the final agreement was thereafter negotiated and executed sometime before August 10, 1982. According to defendants, Brown's and Novelly's testimony further establishes that, while as early as 1980 they discussed the possibility of Brown working for Apex on some basis in the future, those discussions were of a vague and general nature, without mention of compensation, and that the proxy statement was accurate in stating that no dis-

---

**12.** *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted).

**13.** *See id.; Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

cussions occurred during the OPC deliberations.

Plaintiff counters that the testimony of Brown and Novelly is "self-serving" and "lack[s] credibility" and that defendants "are unable to produce a single piece of contemporaneous evidence to substantiate their contention regarding the timing or the circumstances of the negotiations." In reply, defendants correctly argue that a litigant cannot defeat a summary judgment motion merely by challenging the credibility of the witnesses on whose testimony the movant relies.[14] Plaintiff "may not rest upon mere denial of the defendants' evidence, but 'must set forth specific facts showing that there is a genuine issue for trial.' "[15] However, while plaintiff's evidence on the timing issue is slight, it is not nonexistent. Plaintiff relies entirely upon the fact that the commencement of the consulting agreement was contingent upon the consummation of the merger, which, he claims, "establishes that the consultancy is a reward to Brown to be paid only if the merger was consummated and is evidence that Brown and Apex had to have had at least an understanding that Brown would be rewarded." In other words, assuming the agreement was a reward to Brown for helping to secure a favorable vote by the OPC on April 19, 1982, it reasonably could be inferred that prior to the vote and during the OPC deliberations Apex and Brown discussed compensation to him in reward for his services in effecting the merger. With respect to the timing of the negotiations, therefore, plaintiff has set forth a specific fact showing there is a genuine issue for trial.

In sum, both parties' motions for summary judgment are denied and plaintiff is given leave to amend his complaint to conform to the alleged new facts as discussed above.

## THE MOTION TO CERTIFY A CLASS

Plaintiff also moves pursuant to Fed.R. Civ.P. 23(b)(3) for a determination that this action may be maintained as a class action. He seeks to certify a plaintiff class consisting of

all [EDG] shareholders who were owners of shares of Beneficial Interest of EDG on June 29, 1982, the date of issuance of EDG's proxy statement seeking shareholder approval [of the proposed merger], who received $10.50 per share pursuant to said merger, with the exclusion of defendants.[16]

Plaintiff asserts and defendants do not dispute that the putative class includes some 5475 members, so that the numerosity requirement of Rule 23(a) would appear to be satisfied. Moreover, since the alleged wrong involves the dissemination to all former EDG public shareholders of the same proxy statement plaintiff claims was false or misleading, there no doubt would be questions of law or fact common to the putative class members that predominate over any questions affecting only individual members.[17] Nor do defendants argue that plaintiff's claim is atypical of those of the putative class or subject to atypical defenses. The fact that these preliminary requirements are satisfied, however, does not mean the automatic granting of the class action application. A basic, if not the ultimate, issue is whether certification in fact is required to protect the interests of the class or is merely a means of advancing the individual interest of the litigant who purports to speak on behalf of the class. In other words, it remains to be considered whether or not a class action is superior to

---

14. *See McMillan v. Marine Sulphur Shipping Corp.*, 607 F.2d 1034, 1039 (2d Cir.1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *Radix Org., Inc. v. Mack Trucks, Inc.*, 602 F.2d 45, 48 (2d Cir.1979); *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir.1952).

15. *Nash v. Jacqueline Cochran, Inc.*, 548 F.Supp. 676, 681 (S.D.N.Y.1982) (quoting Fed.R.Civ.P. 56(e)).

16. Plaintiff's brief at 1.

17. *See, e.g., Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Moscarelli v. Stamm*, 288 F.Supp. 453, 462 (E.D.N.Y.1968).

other available methods for the fair and efficient adjudication of the controversy.

At the outset, the Court notes it is well aware that plaintiff need not establish a likelihood of success upon the merits of his claims to prevail upon his motion for class certification.[18] It should be emphasized, however, that Rule 23 is not intended to permit a private litigant to enhance his own bargaining power by a claim that he is acting for a class of litigants,[19] at least not when such enhancement appears to be the only substantial "benefit" likely to result from class certification. Nor, as our Court of Appeals has cautioned, should an action be permitted to proceed as a class action, despite the desirability of providing small claimants with a forum in which to seek redress, when it is unlikely to benefit anyone but the lawyers who bring it.[20] Both of these concerns are relevant here.

As already discussed, plaintiff is entitled to a trial on the merits of his remaining claims, but the legal sufficiency of those claims is quite a different matter from their practical value to the putative class. There is no evidence that the putative class members would benefit in any substantial way from the prosecution of this action. Although plaintiff asserts his claims under the federal securities laws, he essentially seeks redress for what he believes was an unfair price paid by Apex to EDG's former public shareholders upon the merger. Yet the record indicates that plaintiff commenced this lawsuit upon the basis of little more than an uninformed hunch and without any substantial prima facie evidence that the merger price was unfair. He based his belief that the price was unfair solely upon a reading of the proxy statement—specifically, upon what

he regarded as a "rather low" appraisal of EDG's real estate portfolio and the fact that "there was no price recorded for the tax loss that was part of [EDG's] assets."[21] When asked about the basis of his view of the real estate appraisal, plaintiff claimed to have knowledge of real estate because of his prior service as an officer of a real estate company, but he acknowledged he was unable to appraise EDG's assets himself and did not even recall the nature of the properties, explaining simply that he "knew real estate was going up and it was the wrong time to sell."[22] As to the tax loss carryforward, which the proxy statement disclosed amounted to approximately $29 million on October 31, 1981, plaintiff estimated its worth at approximately $10 million because he had "seen instances where corporations sold tax losses for a substantial amount of money, approximately a third of the tax loss."[23] Plaintiff relied entirely on his reading of the proxy statement and his general experience in real estate, law, and business. He made no inquiries about the fairness of the merger price and, although he decided it was too costly to assert appraisal rights, he did not respond to a letter he apparently received from another shareholder addressing the possibility of sharing the cost of an appraisal proceeding. He did not even check whether the merger price was above or below the current trading price of EDG stock—it was 40% higher—and acknowledged that he did not know what a fair price would have been because he was "not an appraiser."[24] Rather, he requested his attorneys to investigate the proxy statement disclosure about the consulting agreement between Brown and Apex, whereafter he concluded that "this whole thing was suspicious."[25]

18. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

19. *Free World Foreign Cars, Inc. v. Alfa Romeo, S.P.A.,* 55 F.R.D. 26, 30 (S.D.N.Y.1972); *see Saltzman v. Technicolor, Inc.,* 51 F.R.D. 178, 183 (S.D.N.Y.1970).

20. *See Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 567 (2d Cir.1968); *see also City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir.1974).

21. Hahn deposition of Oct. 11, 1984 at 15.

22. *Id.* at 17.

23. *Id.* at 48.

24. *Id.* at 16.

25. *Id.* at 98–99.

In contrast to these speculations about the fairness of the merger price, a reputable investment banking firm had undertaken an analysis of the business, operations, and financial condition of EDG and rendered an opinion—included in the proxy statement—that the merger price was fair to EDG's public shareholders from a financial point of view. In addition, the merger price exceeded the highest market price of the stock during the preceding seven years and, as already noted, was 40% higher than the (then) current trading price. EDG's public shareholders overwhelmingly approved the merger, voting 94.7% of their shares in favor of it.

In these circumstances, the practical value of this litigation to the putative class members—as well as plaintiff's motivation in bringing this lawsuit, not the only one in which he has sought to represent others—is highly questionable, and his Rule 23 motion ought to be considered in this light. Of course, evidence that the merger price was fair does not diminish plaintiff's right to full and fair disclosure by defendants when they solicited his proxy in connection with the merger and thus cannot prevent him from suing on his own behalf to vindicate his right.[26] But such evidence does bear upon the equities of allowing him to enhance his bargaining power over defendants by purporting to represent the interests of some 5500 others. In view of the totality of circumstances under which this action was brought, class certification appears less likely to advance the genuine interests of the putative class than plaintiff's individual interest in extracting from defendants greater recognition of his claims than they would otherwise receive. However unexceptionable class certification may seem with respect to the other criteria of Rule 23, it would confer upon plaintiff and his attorneys a procedural power that is unjustified absent any show-ing that the putative class members are, in the end result, likely to derive substantial benefit from it. In short, class certification would be procedurally unfair to defendants.[27] Therefore, after careful scrutiny of the record, the Court, in its discretion,[28] concludes that a class action would not be superior to an individual action in terms of the *fair* and efficient adjudication of the controversy, as it must be to satisfy Rule 23(b)(3). Accordingly, plaintiff's motion for class certification is denied.

So ordered.

---

**26.** *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 381–82, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970).

**27.** *See* Fed.R.Civ.P. 23(b)(3) advisory committee note; *cf. Wilcox v. Commerce Bank,* 474 F.2d 336, 347 (10th Cir.1973).

**28.** *See Abrams v. Interco Inc.,* 719 F.2d 23, 28 (2d Cir.1983); *Hornreich v. Plant Indus., Inc.,* 535 F.2d 550, 552 (9th Cir.1976); *City of New York v. International Pipe & Ceramics Corp.,* 410 F.2d 295, 298 (2d Cir.1969); *Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y.1972).