**Daria B. BARRY, Plaintiff,**

v.

**RJR NABISCO HOLDINGS CORP., and RJR Nabisco Holdings Group Inc., Defendants.**

No. 92 Civ. 1479 (RO).

United States District Court, S.D. New York.

May 20, 1993.

Barry A. Weprin, Joshua H. Vinik, Milberg Weiss Bershad Specthrie & Lerach, New York City, for plaintiff.

Melvin L. Cantor, John D. Soriano, John K. Kim, Laura J. Levine, Simpson Thacher & Bartlett, New York City, for defendants.

## OPINION AND ORDER

OWEN, District Judge:

Plaintiff Daria Barry commenced this action *pro se* under the securities laws of the United States. After settlement overtures on behalf of plaintiff fell on unreceptive ears, she obtained counsel and amended her complaint to sue on behalf of herself and all others similarly situated. She now moves for an order pursuant to Rule 23 of the Federal Rules of Civil Procedure certifying a class on behalf of all persons who owned RJR Subordinated Debentures during any part of the period January 31, 1991 through March 1, 1991, but who did *not* tender their deben-

tures in the "Exchange Offer." [1] The Exchange Offer was $465 in cash and 110 shares of common stock for each $1000 principal amount of debentures.[2] She alleges that RJR: (1) intended to redeem untendered debentures at par after the Exchange Offer closed without informing the public of such intent; and (2) misrepresented to the public that the debentures would not be redeemed at par and continue to be traded.[3] Barry alleges that as a result of these material misrepresentations and omissions by RJR, she and other debenture owners, concluding that the retention of the debentures was more to their advantage than their tender, retained their debentures which were however several weeks later, on March 21, redeemed at par. This, she claims, deprived her and others who did not tender of the benefits of the Exchange Offer which due to market factors proved more rewarding.

At the outset, an important operative fact must be noted, to wit, that Mrs. Barry's husband John was calling the shots and testified to the events and his intentions and instructions as follows:

Q. What was the purpose of your call on March 5 [Tuesday] to [your broker] Virginia McGowan?

A. The purpose of my call was to see if it might be possible to late tender the debentures.

Q. And by that do you mean tender your debentures after the exchange offer had expired on March 1 [the previous Friday at midnight]?

A. Right. I knew it had expired on Friday, and I called Virginia on Tuesday to see if it would be possible to late tender.

Q. Did there come a time when you decided that you wanted to tender the debentures?

A. On Tuesday morning I decided that it would be better to tender the debentures.

Q. How did you reach that—

A. Tuesday, March 5.

Q. And how did you reach that decision?

A. From comparing the price where the stock was now trading. I noticed that the stock had stayed at the $10 level, and from comparing the stability in the stock price over the weekend with the dramatic decline in the value of the bonds. If I remember correctly, they traded down very substantially.

Q. And what did Virginia McGowan say to you in that conversation?

A. Virginia told me that in these tenders quite often there are late tenders that come in and that are accepted. That would be my recollection.

Q. So once Virginia McGowan had the letter ... in hand, did you—after that did you have a subsequent conversation with Virginia McGowan on that day?

A. Yes, we did.

    \*     \*     \*     \*     \*     \*

Q. Can you tell me what the substance of that conversation was?

A. Yes. Based on the Tuesday March 5 opening price for the stock and the bonds it made economic sense to late tender the bonds and use the proceeds to repurchase the bonds in the open market. And this was something which was not at all apparent on Friday.

1. Rule 23, to the extent relevant to the disposition of this motion, provides as follows:

   (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if ... (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

2. In the days before the offer expired, the stock was selling at $10 a share making the package approximately $1565 for a $1000 debenture. Ninety percent of the debentures were timely tendered.

3. Mrs. Barry's deposition, however, puts this in some question, for she states she knew prior to the Exchange Offer expiring that the debentures were subject to optional redemption and that RJR's recapitalization could include calling the debentures at par.

Q. Why wasn't it apparent on Friday?

A. Because on Friday—

Q. Friday March 1?

A. Right. On Friday March 1, you didn't know where the stock would be on Tuesday March 5, and you didn't know where the bonds would be on Tuesday March 5, be in terms of price.

Q. And this is what you told Virginia McGowan in that second telephone conversation?

A. I said that given that we now knew where the stock was trading post tender and where the bonds were post tender, that if we could late tender we could use the proceeds to buy the bonds back in the marketplace without the risk of losing money, which was a risk which existed on Friday March 1, but no longer existed on Tuesday March 5.

Q. What was the source of your information about the price of the bonds and the stock between March 1 and March 5?

A. The Wall Street Journal.

From the foregoing, it is clear that RJR is in a strong position to successfully contend on a trial that despite any alleged misrepresentations and omissions, John Barry attempted to "late-tender" Mrs. Barry's over-$100,000 of debentures well before he or his wife had any knowledge that RJR was going to redeem the debentures. Further, from the testimony of John quoted above, their entire conduct here appears to have been no more than financial game-playing designed to create for themselves an option which was no longer available to those who had timely tendered.[4] He wanted to see what the market would do in the days following the expiration of the Offer. If it went badly, he had done the right thing in not tendering the debentures. If, however, it went well, he wanted to force the late-tender and reap the reward. The lack of reliance on any alleged misrepresentations or omissions makes her claim atypical of the class she seeks to represent. Of primary importance under Rule 23 is the requirement that a putative class representative's claims be "typical" of those she seeks to represent. Furthermore, as the litigation will probably focus on John Barry's unusually determined efforts to late-tender his wife's debentures, this creates a clearly "unique defense" which strongly weighs against the certification of a class represented by Mrs. Barry. According to the Court of Appeals for the Second Circuit:

> Regardless of whether the issue is framed in terms of the typicality of the representative's claims, Rule 23(a)(3), Fed.R.Civ.P., or the adequacy of its representation, Rule 23(a)(4), Fed.R.Civ.P., there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her].

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) (citations omitted), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991).

Based on the record before me, it also appears quite clearly arguable that Daria Barry's motion to certify a class is nothing more than the second effort by her and her husband to coerce RJR into awarding her the benefits of a late-tender.[5] *See Hahn v. Breed*, 606 F.Supp. 1557, 1564 (S.D.N.Y.1985) (stating that where plaintiff's "motivation in bringing [a class action] . . . is highly questionable, . . . his Rule 23 motion ought to be considered in this light."). As to this, Mr.

---

**4.** The plaintiff and her husband John are obviously experienced investors. According to Mr. Barry, "I think my wife is more financially sophisticated than many of the smaller holders of [debentures] who did not tender" and "I think I am also more financially sophisticated than those people. . . . I make my living in this business." Mr. Barry, I note, is an attorney who headed the corporate finance department of an investment bank, and spoke for his wife at operative times herein.

**5.** The first time the Barrys apparently attempted to coerce RJR into allowing Mrs. Barry to late-tender, John Barry wrote to RJR on March 5, 1991: "If my [sic] debentures are not accepted, I intend·to hold RJR Nabisco and others responsible for any economic loss I [sic] may have suffered."

Barry stated in his deposition that during discussions with RJR:

> I made it clear that neither my wife nor I had any interest whatsoever in a class action lawsuit, and that our only interest was in protecting her rights and causing RJR to live up to RJR's obligations as she saw them in the prospectus and as I did. And that was stated many times that a, quote, strike suit or a, quote, class action suit was absolutely not intended.

Mr. Barry further stated in his deposition that if RJR had offered his wife an "acceptable" settlement she would not have pursued a class action. Especially troublesome, viewed against John Barry's testimony quoted at the outset, and the allegations of the complaint, are two carefully worded letters John Barry wrote on that crucial Tuesday, March 5, 1991. The first was to his broker Virginia McGowan appearing to lay the blame *on her* for the failure to timely-tender,[6] followed up the same day by a letter to RJR specifically asserting his intention to have timely-tendered, frustrated only by his broker's difficulties with the debentures being in street name.[7] The position taken in these letters could well be argued as a questionable piece of foundation-laying, further casting a cloud over plaintiff Daria Barry's fitness as a class representative.

For all the foregoing reasons, Mrs. Barry does not meet Rule 23(a)(3) and (4)'s requirements for a class representative. Accordingly, her motion for class certification is denied.

So ordered.

---

6. Its entire text is as follows:

> This letter confirms, in writing, my instructions to consummate the tender of all of my RJR Nabisco 17½% Bonds or Debentures due 2007. I am very upset that this was not done earlier and trust you will do everything possible to consummate the tenders.

7. Its text in part is as follows:

> As we discussed earlier today, I have made and continue to make every effort, to no avail, to have my [sic] RJR Nabisco 17½% Debentures due 2007 tendered in the exchange offer. Unfortunately, since my debentures are held in street name, I have not been able to and cannot force a tender notwithstanding such instructions to my broker. Please regard this notice as additional evidence of my intent and attempts to tender.